## AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER KEFALAS IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Christopher Kefalas, being duly sworn, hereby depose and state as follows:

### Introduction

1.      I make this affidavit in support of applications for the following search warrants pertaining to mobile phones that were owned, possessed, and/or controlled by Jameel T. Clark-White (DOB: xx/xx/1993) (hereinafter, "CLARK-WHITE"):

> i.      warrant for information associated with the mobile phone assigned call number (**617**) **320-1221** that is stored at premises controlled by **AT&T Wireless**, a wireless telephone service provider headquartered at 208 S. Akard St. Dallas, TX 75202, as described in Attachment A-1.

> ii.      warrant to search the black Samsung mobile phone that is described in Attachment A-2.

> iii.      warrant to search the black Apple iPhone mobile phone that is described in Attachment A-3.

> iv.      warrant to search the black Summit flip-phone mobile phone that is described in Attachment A-4.

2.      I am currently investigating CLARK-WHITE for federal crimes including Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1), Possession of a Firearm in a School Zone, in violation of 18 U.S.C. § 922(q)(2)(A), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, and Identity Fraud, in violation of 18 U.S.C. § 1028 (the "Target Offenses"). There is probable cause to believe that the information stored by AT&T Wireless, described in Attachment B-1, and the information stored in the mobile phones listed above, described in Attachment B-2, contains evidence, fruits, and/or instrumentalities of these crimes.

3.      The facts in this affidavit come from my personal observations, my review of

records and surveillance video, my training and experience, and information obtained from other officers, agents, and witnesses. This affidavit is intended to show simply that there is probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

### Agent Background

4.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have worked there since January 2015. I am currently assigned to the Bridgewater, Massachusetts, Field Office. Prior to my employment with the ATF, I received a Bachelor's Degree in Criminology from Stonehill College in 2012 and a Master's Degree in Criminal Justice from Northeastern University in 2014. I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy both located in Glynco, Georgia. As an ATF Special Agent, I have training and experience regarding investigations involving firearms and narcotics trafficking and the possession of firearms by prohibited persons, including felons, parolees, narcotics users, and narcotics traffickers. I have additionally received training and experience conducting investigations involving the possession and use of firearms in violent crime and narcotics offenses. As a result of my training and experience, I am familiar with methods commonly utilized by firearms and narcotics traffickers, as well armed offenders, in conducting their business.

5.    I have participated in various aspects of firearms and narcotics investigations, including physical surveillance, surveillance of controlled purchases involving undercover agents and/or cooperating witnesses, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, the exploitation of cellular devices and social media platforms,

and the debriefing of defendants, informants, and witnesses who had personal knowledge regarding firearms and narcotics related offenses.

6.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws of the United States.

## **Target Background**

7.      I am familiar with CLARK-WHITE's background from my review of his criminal history and associated law enforcement reports and records. CLARK-WHITE is a self-admitted and longtime member of the violent Boston-based street gang "H-Block".[1]  In addition to carrying out extreme violence such as shootings and murders, H-Block members are notorious for trafficking controlled substances in Boston, its surrounding communities, and even within the state prison system.[2]  CLARK-WHITE's Board of Probation record is summarized as follows:

| Date | Offense | Disposition |
|---|---|---|
| 4/16/2025 | Armed Robbery; Carjacking; Large Capacity Firearm in a Felony; A&B with Firearm; ABDW Causing Serious Bodily Injury; Trafficking Fentanyl & Cocaine 200+ Grams; Conspiracy to Violate Drug Law; Carrying Firearm; Carrying Loaded Firearm; Possess Large Capacity Firearm Middlesex SC #2581CR00114 (originally #2281CR00183, charged 7/25/22) | Pending |

---

[1] According to Boston Police Department records, CLARK-WHITE has been affiliated with H-Block for more than 10 years. He has tattoos signifying his membership in the gang, such as the Oakland Raiders logo (a common symbol for H-Block, which was originally known as the "Humboldt Raiders") across the front of his neck, and the number "44" (a common H-Block symbol due to the #44 bus route serving Humboldt Avenue) written on his right arm. When CLARK-WHITE interacted with Cambridge Police following the 2021 shooting incident described below, he allegedly told them that "he was with H Block" and "need[ed] to get out of Boston."

[2] Most recently, in August 2024, ten members and associates of H-Block were federally indicted for a variety of drug trafficking offenses as a result of a joint investigation by the Drug Enforcement Agency, Boston Police Department, Massachusetts Department of Correction, and other federal, state, and local agencies dating back to 2021.

| 10/1/2019 | Possession of a Class B Controlled Substance<br>Palmer DC #1943CR1080 | CWOF 1 day |
| 11/14/2018 | Carrying Firearm; Carrying Loaded Firearm<br>Suffolk SC #1884CR00877 | 2.5 years CMTD |
| 2/5/2016 | Large Capacity Firearm; Defaced Serial<br>Number; Negligent Operation<br>Worcester SC #1685CR00132 | 2.5 years - 2.5 years<br>& 1 day CMTD |
| 10/8/2015 | Fail to Stop for Police<br>Roxbury BMC #1502CR2243 | Guilty plea |
| 4/24/2015 | Possession of a Class B Controlled Substance<br>Worcester DC #1562CR3570 | 6 months CMTD |
| 1/3/2013 | Murder; Possession of Firearm<br>Suffolk SC #1284CR11157 | Not Guilty |
| 3/5/2012 | ABDW; Armed Robbery; Carrying Firearm;<br>Carrying Loaded Firearm; Discharging Firearm<br>Dorchester BMC #1207CR0941 | Nolle Prosequi |

8.      In Middlesex Superior Court Docket #2581CR00114, CLARK-WHITE was charged with shooting a man in the chest during an apparent drug transaction and robbery, where police recovered over two kilograms of fentanyl and cocaine in/around the involved vehicles. Investigators also identified a mobile phone recovered near the shooting scene that belonged to CLARK-WHITE, which they searched pursuant to a state search warrant. According to the Commonwealth's initial Statement of the Case, the phone contained text messages discussing quantities and prices consistent with drug distribution, as well as phone numbers linked to individuals with prior charges or convictions for drug offenses. A later-filed Statement of the Case elaborated:

> A review of the subject devices reveals text messages between Clark-White Phone 1 and Gonzalez Phone 1 arranging a meeting in the area immediately prior to the shooting. Communication logs reveal a series of communications between Clark-White Phone 1 and Samuel-Smith Phone 1 in the hours preceding the shooting (consistent with meeting up with one another) and immediately prior to the shooting itself (at the time where video shows the Hyundai leaving its parking spot to join the individual believed to be Clark-White). A review of the search history on Clark-White Phone 1 reveals searches for 137 Spring Street in Cambridge (the location of the meet up) and "fn 5.7" (consistent with the firearm linked to Clark-White via DNA which was used to shoot Gomez) along with terms consistent with drugs and equipment used to process it for distribution ("fentanyl color"

4

*and "cheap blender").*

CLARK-WHITE was ultimately released on $25,000 cash bail with conditions of GPS monitoring, a 9:00 p.m. to 6:00 a.m. curfew, and an order to remain in Massachusetts (other than travel to Rhode Island). That case is still pending.

9.    In Palmer District Court Docket #1943CR1080, CLARK-WHITE was charged with Possession of a Class B Controlled Substance. It appears that CLARK-WHITE was incarcerated at the time he possessed the controlled substances at issue in that case. According to records from the Hampden County Sheriff's Office, CLARK-WHITE was an inmate at the Hampden County Correctional Facility in Ludlow, MA[3] from April 24, 2019, to July 20, 2020. The offense date for #1943CR1080 was listed as May 1, 2019 – approximately one week after his admission to the facility.

10.    According to the InmateWeb database maintained by the Commonwealth of Massachusetts Criminal Justice Information Services, CLARK-WHITE had a prior instance of possessing prohibited substances as a prisoner while incarcerated at MCI-Shirley on March 5, 2017. The incarceration summary states:

> *Then, on 3/5/17, he was RTHC to MCI-Shirley Medium restrictive housing for Attempting to Introduce Contraband in MCI-Shirley minimum via a civilian visitor. More specifically on 3/5/17 while being strip searched following a visit he was found to have a package tucked in his buttocks. The package observed was approximately 2" x 2" in size, and contained a green leafy substance consistent with synthetic marijuana (K2).*

11.    In Worcester District Court Docket #1562CR3570, CLARK-WHITE was originally charged with Possession with Intent to Distribute a Class B Controlled Substance. He ultimately pleaded guilty to a lesser-included charge of Possession of a Class B Controlled

---

[3] Palmer District Court receives cases from towns including Ludlow, MA.

Substance.

12.    In Dorchester BMC Docket #1207CR0941, CLARK-WHITE was charged with robbing and shooting one of his drug customers in the stomach during a would-be drug transaction. When arrested, CLARK-WHITE allegedly had $724 cash and approximately two cell phones in his possession. The Commonwealth ultimately entered a nolle prosequi on the case.[4]

## **Probable Cause to Believe That Federal Crimes Were Committed**

### June 12, 2025, incident at Taylor Elementary School

13.    On June 12, 2025, CLARK-WHITE tossed a loaded handgun equipped with a machinegun conversion device, also known as a "switch,"[5] in the parking lot of the Charles G. Taylor Elementary School in Foxborough, MA as families were arriving for a 4th grade graduation ceremony. He then fled the scene in a vehicle that contained controlled substances. The evidence implicating CLARK-WHITE in this incident is summarized as follows.

14.    On that date at approximately 9:27 a.m., Foxborough Reserve Police Officer Brendan Murphy responded to a two-car motor vehicle crash in front of the Taylor Elementary School. He learned from bystanders that a black-colored vehicle, later determined to be a Subaru Outback, struck a white Ford Explorer on South Street at the exit of the school's parking lot. Witnesses pointed out the male operator of the Subaru, who had moved his vehicle back into the parking lot and was pacing around the area. WITNESS A told Officer Murphy that the male operator "ditched" something under some parked cars in the lot. No witness observed any occupants other than the male operator in or around the Subaru.

---

[4] This was a separate incident from Suffolk Superior Court Docket #1284CR11157, in which CLARK-WHITE and his brother Rashawn Clark were acquitted for the shooting murder of a rival gang associate on October 1, 2012.

[5] A "switch" is a machine gun conversion device that converts a semi-automatic pistol into a fully automatic machine gun. I have not yet received a test fire report from the Massachusetts State Police.

15.     Officer Murphy briefly interacted with the male operator, whom he described as a black male, over six feet tall, with a shaved head and full beard, wearing a white sweater with stripes around the abdomen and dark pants. Those physical features are consistent with the appearance of CLARK-WHITE. The male operator stated he was not injured, that he was just trying to get to his son's graduation, and that he was "trying to call his baby mama." WITNESS B confirmed that the male operator was talking into a mobile phone following the crash.

16.     Officer Murphy looked under the parked cars to which WITNESS A drew his attention, and he observed a handgun behind the front passenger-side tire of a white Volvo SUV. As soon as he stood up, he observed that the male operator had re-entered the Subaru and was speeding out of the parking lot, fleeing northbound on South Street. Officer Murphy radioed for backup and secured the area of the firearm. Underneath a black Lincoln SUV parked directly in front of the Volvo, he found two additional loaded magazines, one of which was an extended magazine with a 30-round capacity. A detective arrived and secured the firearm, which was a .45 caliber Glock 41 pistol equipped with an orange machinegun conversion device. A photograph of the firearm and magazines follows:



17.    At approximately 11:17 a.m., Foxborough Police Department received a call from a resident of 10 Shaw Place in Foxborough, MA, reporting that a random unknown vehicle was parked his driveway. He provided the vehicle's license plate number as #FW999X, which matched the plate number provided by a witness to the crash for the vehicle that fled the scene. The residence at 10 Shaw Place is approximately one mile north of the Taylor Elementary School. Officers responded to 10 Shaw Place and observed the black Subaru Outback bearing license plate #FW999X parked in the driveway. The Subaru had damage to its front driver's side, consistent with witness descriptions of the crash, and it was missing its driver's side door mirror and the mirror's rear casing – both of which were located amongst the debris at the crash scene.

18.    A neighbor provided police with surveillance video from his doorbell camera that faced 10 Shaw Place. The video shows the black Subaru pulling into the driveway of 10 Shaw Place at a timestamp of 9:34 a.m. (approximately two minutes after the Taylor Elementary School

surveillance video showed the vehicle fleeing the parking lot after the crash). The video then shows a lone male, who appears generally consistent with Officer Murphy's description, exiting the driver's seat and running north along Shaw Place.

19.    Investigators obtained a search warrant from the Wrentham District Court to search the Subaru. Inside a cigarette box resting near the gear shifter, they located nine white pills imprinted with "OP" on one side and "10" on the other. According to a search of open-source identification materials, the pills appeared to be 10mg OxyContin. OxyContin is a brand name for oxycodone, which is a Schedule II controlled substance. The Massachusetts State Police drug laboratory subsequently tested a sample from the tablets and confirmed that it contained oxycodone. Inside a pink and white striped Victoria's Secret tote bag in the trunk, investigators located a plastic container holding approximately 11 grams of an unidentified white powdery substance. The Massachusetts State Police drug laboratory subsequently tested the powder and identified the presence of sodium bicarbonate, also known as baking soda. I am aware that baking soda can be used by drug traffickers as a cutting agent to increase the volume of powder cocaine, and it is also commonly used to cook powder cocaine into crack cocaine.

20.    Investigators contacted the registered owner of the Subaru, who stated that her domestic partner, WITNESS C, sold the vehicle prior to the date of the crash. WITNESS C informed investigators that she sold the Subaru in a cash transaction to a friend-of-a-friend named "Jameel Clark" also known as "Meel." WITNESS C stated this transaction occurred at the Shell gas station in Taunton on June 7, 2025, at approximately 8:00 p.m.[6] WITNESS C stated that

---

[6] I obtained exterior surveillance video from this Shell gas station for June 7, 2025, and did not observe the Subaru during the timeframe provided by WITNESS C, possibly indicating a difference in date and/or time of the transaction. Investigators also obtained numerous photographs of the Subaru captured by "Flock" license plate readers positioned along roadways in New Beford, Taunton, Dartmouth, and Fairhaven, MA from June 2, 2025, to June 11, 2025. This suggests that CLARK-WHITE may have already been in possession of the Subaru on those

"Jameel" mentioned that he had a "curfew." WITNESS C said "Jameel" used the phone number **(617) 320-1221** to correspond with her, most recently on the date of the crash at approximately 3:37 p.m. WITNESS C later told investigators that the vehicle was cleaned and empty of personal items when she sold it.

21.     Investigators entered phone number **(617) 320-1221** into a law enforcement database and discovered that it was associated with CLARK-WHITE. Investigators learned that CLARK-WHITE had pending case #2581CR00114 in Middlesex Superior Court, referenced above, for which he had a 9:00 p.m. curfew and was subject to GPS monitoring. Investigators contacted the Massachusetts Electronic Monitoring Program ("ELMO"), and an employee informed them that CLARK-WHITE's GPS device was on South Street in the area of the Taylor Elementary School between 9:26 a.m. and 9:32 a.m. – the exact times that the Subaru was at the crime scene, as documented by the school's surveillance video. ELMO employees informed investigators that sometime that evening, CLARK-WHITE evidently cut off his GPS bracelet, because his device triggered a proximity alert and a strap alert, and its last known location was in Fairhaven, MA. ELMO employees were thereafter unable to contact CLARK-WHITE.

22.     On June 13, 2025, the Middlesex Superior Court issued an arrest warrant for CLARK-WHITE based upon his violation of conditions of release. Foxborough PD also obtained a complaint and arrest warrant charging CLARK-WHITE in Wrentham District Court Docket #2557CR0804 with various firearm, drug, and motor vehicle offenses in connection with the above incident. CLARK-WHITE remained in warrant status until he was arrested by the U.S. Marshals Service in Maine over a month later, which is described further below.

---

dates. CLARK-WHITE's last-known address is 31 Babbitt Street in New Bedford, whereas the registered owner's address is in Quincy, MA.

23.    Investigators obtained CLARK-WHITE's GPS monitoring data for June 12, 2025, from the Massachusetts Office of the Commissioner of Probation. CLARK-WHITE's GPS bracelet recorded his location via longitude and latitude coordinates approximately once per minute. His first recorded location at 8:36 a.m. was in the city of New Bedford. He then traveled northbound on Route 140, to Route 24 north, to Route 495 north, to Route 95 north into the town of Foxborough. He exited the highway onto Commercial Street, turned left on Walnut Street, and proceeded to the intersection of Walnut and South Streets at 9:26 a.m. At 9:27 a.m., he was at the southern end of the Taylor Elementary School parking lot, as shown by the following coordinate mapping:



At that time, the Taylor Elementary School surveillance video depicts the suspect exiting the black Subaru and then bending over near the passenger sides of the white Volvo and black Lincoln, where the firearm and magazines were discovered. A screenshot of the surveillance video at 9:27

a.m. follows:



CLARK-WHITE's GPS coordinates for the next five minutes line up precisely with the location of the suspect on the surveillance video. At 9:32 a.m., he was at the northern exit of the school's driveway where it meets South Street – the same time the Subaru fled the scene northbound on South Street in the video. At 9:34 a.m., CLARK-WHITE was in the vicinity of 10 Shaw Place, as shown by the following coordinate mapping:



This is the time at which the doorbell camera facing 10 Shaw Place recorded the suspect parking the Subaru in the driveway and running away, as depicted in the following screenshot:



Thereafter, CLARK-WHITE waited along Carpenter Street for approximately 17 minutes, until he was seemingly picked up and began traveling southbound. At 10:41 a.m., he arrived at 31 Babbitt Street in New Bedford, which was his last-known residential address. Between approximately 12:00 p.m. and 4:00 p.m., CLARK-WHITE traveled to various areas around New Bedford. At 4:15 p.m., he arrived at the Lowe's Home Improvement store in Dartmouth, MA. He was inside the store for approximately five minutes. He then traveled 0.7 miles to the Mobil gas station on Faunce Corner Road, where the GPS remained from 4:27 p.m. to 5:32 p.m. The GPS then traveled to the parking lot of a liquor store on Sconticut Neck Road in Fairhaven, MA, where it remained for five minutes before reaching its ultimate destination at the end of a peninsula on West Island Town Beach in Fairhaven.

24.     Investigators also obtained records from the Charles G. Taylor Elementary School. Those records confirmed that CLARK-WHITE's son was enrolled as a full-time student at Taylor Elementary, and the school held a year-end assembly on June 12, 2025, at 10:00 a.m.

<u>July 22, 2025, arrest of CLARK-WHITE</u>

25.     On July 22, 2025, members of the U.S. Marshals Service and the Maine Violent Offender Task Force attempted to locate CLARK-WHITE at 105 Cumberland Street in Bangor, ME. At approximately 5:00 p.m., CLARK-WHITE exited the residence and entered the rear passenger seat of an Uber vehicle.[7] Investigators stopped the vehicle and arrested CLARK-WHITE. During his arrest, CLARK-WHITE denied his true identity and claimed to investigators that he was Dana Sequiera. CLARK-WHITE possessed a Massachusetts driver's license bearing the name, address, date of birth, and license number of a real person named Dana Michael Sequeira (DOB: xx/xx/1986); however, the photo on the driver's license appeared to be CLARK-WHITE, possibly with altered hair, and did not match the current Registry of Motor Vehicles image for Dana Michael Sequeira. Additionally, the last name on the license possessed by CLARK-WHITE was misspelled as "Sequiera." Investigators concluded that the license was a forgery.

26.     CLARK-WHITE was positively identified by his face, tattoos, and scars. He was transported to the Penobscot County Jail for booking on a charge of Fugitive from Justice. A booking photograph of CLARK-WHITE follows:

---

[7] Uber is a ride-sharing service that allows users to order and pay for rides with a mobile phone application that stores the user's personal information and payment methods.



27.     Penobscot County Jail staff conducted a strip-search of CLARK-WHITE. Inside CLARK-WHITE's underwear, they recovered a large clear bag of suspected narcotics. Bangor Police determined that the bag weighed approximately 88 grams and contained five smaller bags, the contents of which were field-tested and itemized. One 30-gram bag field-tested positive for cocaine. The other bags field-tested inconclusive, but all contained either white/brown powder or chopped-up blocks of soap-like substance, and they were submitted for further testing. CLARK-WHITE was additionally charged with Trafficking Schedule W Drugs[8] and Trafficking in Prison Contraband.

28.     CLARK-WHITE was transported in custody to Middlesex Superior Court on August 14, 2025, to remove the warrant on Docket #2581CR00114. Accompanying CLARK-

---

[8] In Maine, schedule W includes cocaine, fentanyl, and other substances.

WHITE was a bag of his property from his arrest in Maine. This property consists of one black Samsung smartphone, one black Apple iPhone, one Summit flip-phone broken in half, one black Dior wallet, two personal photographs of CLARK-WHITE with a female, the previously mentioned Massachusetts Driver's License in the name of Dana Sequiera, One Capital One Bank Visa card in the name of Dana M Sequiera, one Green Dot Debit card, one Mass DTA card in the name of Tariyah Mixon, one phone number on a piece of paper with the name "Zoe", two small keys, and a Boost Mobile card from 95 Rockdale Ave. New Bedford, MA 02745. CLARK-WHITE's bail was revoked on Docket #2581CR00114, and he was ordered held without bail for 90 days. His property is still in the custody of the Massachusetts Trial Court Officers at Middlesex Superior Court as of this writing.

**Probable Cause to Believe that the Mobile Phones
Contain Evidence, Fruits, And Instrumentalities**

29.    Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that the mobile phones described in Attachment A-2, Attachment A-3, and Attachment A-4 (collectively, the "Subject Devices") will contain evidence, fruits, and instrumentalities of one or more of the Target Offenses.

30.    As described above in relation to his pending Middlesex Superior Court case, CLARK-WHITE has a documented history of drug trafficking activity and using a mobile phone to facilitate that activity. At the time of the Taylor Elementary School incident, CLARK-WHITE possessed a loaded large-capacity firearm, while driving a vehicle that contained controlled substances, and he was actively using a mobile phone. While he was on the run from those offenses, he was evidently using a mobile phone to secure rides with Uber. He also possessed the three Subject Devices when he left a house in Maine to enter an Uber while in possession of 88

grams of apparent controlled substances. Accordingly, the data on the Subject Devices is likely to contain evidence of CLARK-WHITE's drug dealing activity, including correspondence with buyers, suppliers, and co-conspirators. The data will likely corroborate CLARK-WHITE's GPS monitoring information and support that he was indeed the person responsible for tossing the firearm on the grounds of the Taylor Elementary School. The data will likely include evidence of his whereabouts and activities while he was a fugitive from justice, which is relevant to his consciousness of guilt on the Target Offenses. And, the data will likely include evidence of his true identity, as well as his fraudulent use of the identity on the false driver's license he carried at the time of his arrest.

31.     I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

32.     I know that many smartphones (which are included in Attachment B-2's definition of "hardware") can now function essentially as small computers.  Modern Samsung and Apple iPhone phones, such as CLARK-WHITE's phones, are smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

33.     I am aware that individuals who engage in drug trafficking frequently use mobile phones to facilitate their illegal activities, including by communicating with other members of the drug trafficking organization, their associates, and customers, as well as conducting surveillance and counter-surveillance in furtherance of their objectives and to protect the proceeds of their illegal activities. Individuals engaged in drug trafficking often utilize cell phones to arrange transactions, including taking orders specifying the type and quantity of a controlled substance and negotiating the price, time, date, and location of a drug transaction. Individuals involved in drug trafficking often take photographs and/or videos of their current drug supply to share with customers to entice them into drug transactions.

34.     Drug traffickers will often have multiple phones. In some instances, dealers will have a phone used specifically to conduct "street-level distribution," which is considered a customer phone. This is a phone which a dealer will use primarily to communicate with customers. The same dealer will use a different phone to communicate with his or her drug supply sources and other high-level members within his or her organization. This is done in an attempt to layer the dealer's operation and make it difficult for law enforcement to identify the various ways in which they communicate and conduct business. It is common practice for each of the multiple phones utilized by the dealer to be subscribed in other people's names or prepaid phones obtained with false information.

35.     Although drug dealers often use phones subscribed to other persons, change phones regularly, and/or use different phones for different purposes contemporaneously, I am aware that the phones themselves are often maintained by the user, even after they are deactivated. This is done for several reasons:

a.      The phones are valuable; they may be turned off for a period of time and then reactivated at a later date with the same or a different phone number on it;

b.      The phones contain valuable information, as stated below. Those involved in the business of illegal narcotics distribution are in the difficult position of attempting to limit law enforcement's ability to infiltrate them using their phones. Consequently, narcotics traffickers often use multiple phones, change phone numbers regularly, and limit access to certain phone numbers. At the same time, these persons need to maintain contact with their customers, co-conspirators, and suppliers. This dynamic forces these criminals to maintain contact information – usually within the phone itself – for their business, while remaining vigilant about law enforcement. Hence, these criminals maintain deactivated phones for the purposes of keeping current contact information for customers, co-conspirators, and suppliers;

c.      There is a perception among those who distribute illegal narcotics that a deactivated phone is a safe phone – that is, that the phone is no longer a criminal instrument and there is no need to dispose of it; and,

d.      There is a perception that, because those who distribute illegal narcotics are using phones in the names of other people or fictitious people, a deactivated or active phone is more difficult to trace to its user, making it safer, and therefore more likely to be maintained by the real user.

36.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.   This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system

data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

37.     Based on my knowledge and training and the experience of other law enforcement officers and agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because:

a.     The volume of evidence storage media such as hard disks, flash drives, CDs, and DVDs can store is the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.     Technical requirements in analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.   Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the

system as a "booby trap."

38.     Consequently, I am requesting authority for law enforcement agents to either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

<u>**Probable Cause to Believe that the Records of AT&T Wireless<br>Contain Evidence of the Target Offenses**</u>

39.     Investigators used a law enforcement database to determine that the mobile phone service provider for number **(617) 320-1221** is AT&T Wireless, headquartered at 208 S. Akard St. Dallas, TX 75202. On July 1, 2025, investigators submitted a preservation request to AT&T Wireless, pursuant to 18 U.S.C. § 2703(f)(1), to preserve all stored electronic communications and other files (non-content) associated with number **(617) 320-1221**.

40.     In my training and experience, I have learned that AT&T Wireless is a company that provides cellular telephone access to the general public. I know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning System

("GPS") data. I know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

41.     Based on my training and experience, I know that wireless providers such as AT&T Wireless can also collect per-call measurement data, which may be referred to as the "timing advance" data, Network Event Location System (NELOS), Time Difference of Arrival (TDOA), "real-time tool" or "RTT" data, Reveal, or TrueCall Reports. This type of data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

42.     Based on my training and experience, I know that wireless providers such as AT&T Wireless typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crime under investigation because the information can be used to identify the phone's user or users and may assist in the identification of co-conspirators.

43.     Accordingly, there is probable cause to believe that the records described in Attachment B-1 will contain evidence of the Target Offenses. The records will likely reveal information about who CLARK-WHITE was speaking to on his phone immediately following the

crash, as well as anyone who assisted him while he was a fugitive from justice, and anyone with whom he conspired to distribute controlled substances. His cell site location information will corroborate his GPS monitoring data and support that he was indeed the person responsible for tossing the firearm on the grounds of the Taylor Elementary School. This location information will also shed light on CLARK-WHITE's locations and activities after he removed his GPS bracelet and became a fugitive from justice, which is relevant to his consciousness of guilt on the Target Offenses. Finally, receiving these AT&T Wireless records from a date beginning on June 1, 2025 will assist investigators' efforts to establish when CLARK-WHITE first obtained the Subaru and how often he traveled in it, by comparing the data to the Subaru's locations as documented by the Flock license plate readers (see footnote 6 above).

## CONCLUSION

44.      Based on the information described above, I have probable cause to believe that CLARK-WHITE has committed federal crimes including Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1), Possession of a Firearm in a School Zone, in violation of 18 U.S.C. § 922(q)(2)(A), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, and Identity Fraud, in violation of 18 U.S.C. § 1028. I also have probable cause to believe that evidence, fruits, and instrumentalities of one or more of these crimes, as described in Attachments B-1 and B-2, are contained within the records of AT&T Wireless described in Attachment A-1 and the mobile phones described in Attachments A-2, A-3, and A-4.

Sworn to under the pains and penalties of perjury,

Christopher Kefalas
DLC

Christopher Kefalas, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Attested to by the applicant by telephone in accordance with
the requirements of Fed. R. Crim. P. 4.1 by

Hon. Donald L. Cabell
United States Chief Magistrate Judge

on September 11, 2025.

25

**ATTACHMENT A-1**

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number (**617) 320-1221** ("the Account"), that are stored at premises controlled by **AT&T Wireless** ("the Provider"), headquartered at 208 S. Akard St. Dallas, TX 75202.

**ATTACHMENT A-2**

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following:

1. One (1) black Samsung Smartphone



The equipment is located at the Middlesex Superior Court 200 Tradecenter Drive, Woburn,

Massachusetts 01801 in the possession of the Middlesex Superior Court - Court Officer's Office.

**ATTACHMENT A-3**

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following:

1.  One black Apple iPhone



The equipment is located at the Middlesex Superior Court 200 Tradecenter Drive, Woburn,

Massachusetts 01801 in the possession of the Middlesex Superior Court - Court Officer's Office.

**ATTACHMENT A-4**

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following:

1.   One black Summit Flip Phone



The equipment is located at the Middlesex Superior Court 200 Tradecenter Drive, Woburn,

Massachusetts 01801 in the possession of the Middlesex Superior Court - Court Officer's Office.

**ATTACHMENT B-1**

**Items to Be Seized**

I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A-1 for the time period June 1, 2025 through July 22, 2025:

A.    The following information about the customers or subscribers of the Account:

   i.    Names (including subscriber names, user names, and screen names);

   ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Local and long distance telephone connection records;

   iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.    Length of service (including start date) and types of service utilized;

   vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i.   Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; Internet Activity Reports; IPDR Reports; and source and destination Internet Protocol addresses;

ii.  Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

iii. All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Account, to include all voice, SMS, MMS, and data activity; and

iv.  All per call measurement data (PCMD) and engineering records for each connection made to or from the Account, to include "timing advance" data, Network Event Location System (NELOS), Time Difference of Arrival (TDOA), "real-time tool" or "RTT" data, Reveal, and TrueCall Reports for Voice/SMS/MMS/Data Usage (EVDO/LTE/etc.).

II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1), Possession of a Firearm in a School Zone, in violation of 18 U.S.C. § 922(q)(2)(A), Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, and Identity Fraud, in violation of 18 U.S.C. § 1028, involving JAMEEL T. CLARK-WHITE during the period of June 1, 2025 through July 22, 2025.

**ATTACHMENT B-2**

**Items to Be Seized**

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. §§ 922 (relating to firearm offenses) or 1028 (identity fraud), or 21 U.S.C. § 846 (conspiracy to distribute or possess with intent to distribute controlled substances) (the "Target Offenses"), including those related to:

      A.      The following people:

            1.      Jameel T. Clark-White (DOB: xx/xx/1993) ("CLARK-WHITE");
            2.      Dana M. Sequeira (DOB: xx/xx/1986);

      B.      The following topics:

            1.      Manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, pill/tablet presses, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, telephone bills, bank and financial records, and storage records, such as storage unit and storage locker receipts and safety deposit box rental records and keys;
            2.      Methods of communications between co-conspirators, rivals, or victims including the telephone numbers, messaging applications, and social media accounts used;
            3.      Communications, photographs and video and audio recordings which document an association with other co-conspirators and/or which display controlled substances, and chemicals/materials, mechanisms, packaging and adulterants used in the manufacturing and distribution of controlled substances;
            4.      Proceeds of drug trafficking, receipts and records of items purchased, transaction records, automobile transaction records, jewelry and fine metal transaction records, the manner and means by which items and necessities are paid for, transactions in cash and other monetary instruments, gambling records, sports betting records, betting slips, records reflecting transactions at casinos,

jewelry, chains, bracelets, diamonds, credit cards, debit cards, money orders, and other instruments by which cash proceeds can be transacted and converted into good and services;

5.　　Locations and physical premises where evidence of the Target Offenses, and things of value are being stored and concealed, including storage units, safe deposit boxes, rental units, lockers, and properties, and the location and the physical whereabouts of where controlled substances, and items, materials, chemicals, equipment and paraphernalia associated with the manufacturing, ordering, packaging, importation, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, pill presses, manuals and other items and materials related to pill presses, packaging materials, storage bins, containers, cutting agents, and scales, are stored, including geolocation information and data placing the user in proximity to these locations and premises;

6.　　Unlawful possession of firearms, ammunition, and firearms-related accessories, including but not limited to selector-switches;

C.　　The travel or whereabouts of CLARK-WHITE between June 1, 2025 and July 22, 2025;

D.　　The identity, location, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

E.　　The following data that is relevant to the Target Offenses:

1.　　Names and contact information that have been programmed into the device(s) (including contacts lists);

2.　　Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

3.　　Text messages both sent to and received from the device(s) (including any in draft form);

4.　　Incoming and outgoing voice mail messages both to and from the device(s);

5.　　GPS data;

6.　　Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in

draft form);

F.     Evidence of who used, owned, or controlled the equipment;

G.     Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

H.     Evidence of the attachment of other hardware or storage media;

I.     Evidence of counter-forensic programs and associated data that are designed to eliminate data;

J.     Evidence of the times the equipment was used;

K.     Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

L.     Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

M.     Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators.

II.     Serial numbers and any electronic identifiers that serve to identify the computer equipment.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## Definitions

For the purpose of this warrant:

    A.    "Equipment" means any hardware, software, storage media, and data.

    B.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

    C.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

    D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

    E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

    F.    A "record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.

Law enforcement personnel are authorized to retain a digital copy of all computer equipment seized pursuant to this warrant until the completion of its investigation or the completion of any trial, appeal, or collateral proceeding involving the records and data seized, after which time law enforcement personnel will dispose of the account duplicate consistent with the agency's evidence disposal policy.